*Common Pleas of Lackawanna County.*

## COMMON'TH. Ex. Rel. JAMES HOPKINS vs. MARY O'BOYLE Et Al.

### Habeas Corpus to Obtain Possession of Child.

The custody of the grandfather over a child preferred to that of the grandmother on the facts of the case.

If the merits, otherwise, were with the defendants, yet when they have changed the juris_diction over the child to another court by force or artifice, the latter court will hesitate to decide the case on its merits. Courts will not encourage force in asserting alleged claims when justice can be obtained through the forms of law.

Opinion by HAND, J.

This is a *habeas corpus* issued at the instance of James Hopkins to obtain the possession of James F. Hopkins, a child six years of age.

We are met at the outset of this case by the objections on the part of the defendants' counsel that the writ will not lie on the affidavit made on the ground that it is not allowable at common law, and enough is not set out to authorize the writ under the statute; also that the writ is not properly issued in that it does not set out the recital of the Act of Assembly. We overrule these objections, the law in its spirit and the practice under it avoiding technicalities as far as possible when a proper party applies for the writ and enough is alleged to show apparently a case of illegal restraint. The recital authorized by the Act of Assembly we consider was intended to facilitate the execution of the writ and to sweep away frivolous excuses for not obeying its precepts.

In this case it appears from the evidence that the father and mother of the child are both dead.

James Hopkins, the relator, is the grandfather; John Hopkins, his son, married Mary Ann O'Boyle, and the fruit of that marriage was this boy, now six years of age. John Hopkins lived before his death in Providence. In May, 1877, this old man removed his son, who was sickly, his wife and child to a house built for them on his farm, in Salem, Wayne county. In January, 1878, the mother of the child died in Providence. The son and this boy from that time lived on the farm in Wayne county. On

the 29th of March, 1878, the father died, leaving this child
in the care of his grandfather, where he remained until a
few days before this writ issued. Previous to his death
and upon his death bed the father committed the care of
this child to the grandfather, and in pursuance of that the
boy has remained on the farm under the care of this old
man, his grandfather, his grandmother, and a daughter,
his aunt, who appear from the evidence to have taken,
during the two years and upwards of his stay with them,
proper care in his maintenance and education. During his
earlier stay in Salem he visited Providence with his
mother, going back and forth. After his father's death,
his grandparents in Wayne county sent him to private and
public school, and he has learned to read. While he was
on his way to school in the early morning two of these
defendants, his uncles, a few days ago, drove up and cap-
tured the boy, took him into their carriage and brought
him to Providence, placing him with the other defendant
his grandmother, where he has been until the issuing and
disposition of this writ. The question for us to decide is
whether the grandfather on the father's side, or the grand-
mother on the mother's side shall have the custody of this
child. Had we nothing else to guide us but the statement
of this question we would say unequivocally that the law
of centuries has answered the question in favor of the
grandfather. Bearing in mind, however, this view of the
law, we must answer this question according to the merits
and law of this case as deduced from all the facts proven.
It appears that this old man James Hopkins has lived
with his present wife for a period of thirty-two years,
thirty of which or thereabouts have been spent in Wayne
county. They were duly married by a priest of their own
faith, and have borne a family of children now grown to
maturity. He has acquired two farms where he lives, one
of which he has, as he states, assigned to his wife to pro-
vide her a home in case of his death, is free from debt,
and has other means at his disposal. The testimony of his
neighbors who have known him, some for a long time,

others for a shorter time, is uniform as to his character, against which they have never heard a word. One or two have spoken of him as stern in his family, his wife says not more stern.than the faults of his children have demanded. In his first cross-examination counsel asked if he had more than one family; which he answered in the negative; also denied having been married before his present marriage. Upon further cross-examination he admitted a marriage in Ireland before he came to this country, which, he said, he did not consider a marriage as it took place unbeknown to him when in a state of intoxication. He lived with his first wife two months, and left her, coming to this country. He soon after heard of her marriage to another person, from his brother, and then heard of her death, after which he married his present wife. Upon the relator's alleged equivocal answer counsel seek to raise the question of illegitimacy of John Hopkins and destroy the relation of James Hopkins to this child.

The defendant also shows that the mother of this child on her death bed desired the child to be left with her mother, and that the father promised that he would keep him while he lived, and then commit him to the custody of his grandmother O'Boyle.

Another point urged by the defendants' counsel is that the child had gained a settlement under the poor laws in Providence, and that should fix his residence with his grandmother.

The defendant, Mary O'Boyle, has a small lot and house in or near the Notch at Providence; is supported by her two sons who give her of their wages, and counsel offer security for the keeping of the child that he shall not become a charge upon the Poor District. Other witnesses testify to the fitness of the grandmother to care for the boy. The boy, upon examination of defendants' counsel, (not under oath) said he preferred to go with his grandmother, and upon cross-examination said he was promised money if he would so state, so that his expressions are without weight either way in deciding this case.

The ability of the grandfather is fully proven to care for this boy, and several witnesses give the preference to his custody. Mr. Duggan, one of defendants' witnesses whose appearance is wholly in his favor and disinterested, is decided as to this.

We are now prepared to take up the questions raised before us, and however unpleasant our duty may be, decide the question from which there is no escape. Either the grandfather or the grandmother is entitled to the custody of this child. There is no middle or double ground in this case. The conclusion at which we have arrived is one in which our best discretion and the law wholly coincide.

Admitting the agreement alleged to have been made between the father and the mother on her death bed to have been all that is claimed for it, did it annull the fatherly care and discretion which John Hopkins was bound by the law of nature and the relation of father as recognized by the law to exercise? Certainly not. It may have been made in good faith, and yet he was bound to change it if he afterwards discovered it best. The cases where the courts have forced such an arrangement have only been where the paternal control was wholly surrendered for a long period of years and the child had grown into and under his new relations. Here, however, we have the father living with his child at his home in Salem, and in clear language indicating from time to time his wishes, and upon his death bed, in a manner amounting to an almost testamentary disposition, placing the custody of this child with the grandfather. We have the child in pursuance of that living for a year and a half with the family in Salem.

The argument ingeniously urged and based upon the settlement of the child proves too much; it pamperizes the child when he is no pauper, the poor laws requiring the grandparents to support their grandchildren, if of sufficient ability. The remaining position taken by defendants is that of the non-paternity of James Hopkins. This is argued with great force by the counsel upon the Court. In order to sustain it the facts ought to unequivocally support

it.   The only evidence is that of James Hopkins.   Does
he prove his marriage to his present wife an illegal one?
Upon every rule of testimony we are compelled to .answer
this decidedly in the negative.   His answers, if taken as
admissions, must be taken together and being so taken
they decidedly prove the legitimacy of his present marriage.
All legal presumptions at this day are in his favor, aside
from his own testimony.   He was married by the priest of
his own church, he has lived for thirty years in one place,
raised a family of children, no suspicion appears to have
been whispered against him until this investigation.  Upon
the facts we do not think this question is before us.   Hav-
ing disposed of the points raised by the defendants' counsel
we come now to the controlling facts of this case.   What-
ever view we might have taken of the case on the part of
the defendants, they by their conduct in capturing this
boy have precluded a court of justice from affirming their
custody of this child.   He for over two years had enjoyed
a quiet and comfortable home in Wayne County.   He was
in the quiet and undisturbed custody and control of his
grandparents within the jurisdiction of another court and
on the moring was pursuing his way to school as usual.
He is taken by two of these defendants with no notice to
those who are responsible for him, with no opportunity to
protect him, or furnish him his clothes at home or to the
child to offer the ordinary courtesies or kindness toward
those to whom he had become attached.   In other words
these defendants took the law into their own hands and
ruthlessly severed this relation which existed for a time
long enough to be cemented with love and attachment on
the part of parents and child.   If these defendants had or
have a legal right to the custody of this child it is impos-
sible for us in this proceeding to give it to them without
conniving or affirming the act by which they captured this
boy.   The principles governing cases of *habeas corpus*
it is held are akin to those of Chancery.   It is surprising
that in this land of law and justice persons are found still
to take the law into their own hands.   These defendants

by so doing embarrassed their own counsel in the conduct of their cause and the Court in its disposition. This Court has no symyathy with lawlessness and cannot countenance it however indirectly. It is well settled by our Courts that parties can gain no advantage in the tribunal of justice by trick, artifice or force. The law was open for the defendants in the ordinary and proper manner, to assert their rights if any they have; having sought to avoid their duty in respect to law, they can have no footing under the law here. Justice would compel us to restore the child from whence it was taken by force whatever might now be shown as to the merits of their claim. They had no right to capture this boy in the way they did, no right to bring him from his home except by a judicial and orderly proceeding. The sooner this principle is learned the better it will be for parties in court and for society at large.

Another controlling fact in this case is, that the grandfather has the ability beyond question to provide for the child, while the grandmother is herself dependent, by her own testimony, upon others for her own support. In case of her death the child would have no other person bound for his support but the grandfather and grandmother on the Hopkins side.

And now to wit, Oct. 6th, 1879, the child, James F. Hopkins, is delivered to the custody of James Hopkins his grandfather the relator in this case, to be by him maintained and cared for until by due proceeding such custody is legally changed.

---

A Tennessee Judge, in charge of a jury in a hotly contested case, very earnestly remarked, " Heaven forbid that I should ever sit on a bench at which my friends shall not fare better than my enemies." Then he solemnly closed his charge to the jury by urging them to " believe very little of what they saw and nothing at all of what they heard."